UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Laura Kronen,

                          Plaintiff,          CV-05-5473 (CPS)

    - against -                               MEMORANDUM OPINION
                                              AND ORDER

Natori, Inc.,

                          Defendant.
----------------------------------------X


SIFTON, Senior Judge.


     Plaintiff Laura Kronen ("Kronen") brings this action against

defendant Natori, Inc. ("Natori"), her former employer, alleging

that defendant discriminated against her when defendant

terminated Kronen's employment, allegedly on the basis of her

pregnancy, in violation of Title VII of the Civil Rights Act of

1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*,[1] the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq*,[2] and

_____

     [1] Title VII provides in part that it is unlawful for an employer to
"discharge any individual, or otherwise to discriminate against any individual
with respect to compensation, terms, conditions, or privileges of employment,
because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Under
the Pregnancy Discrimination Act ("PDA"), a 1978 amendment to Title VII,
"[t]he terms 'because of sex' or 'on the basis of sex' include, but are not
limited to, because of or on the basis of pregnancy, childbirth or related
medical conditions; and women affected by pregnancy . . . shall be treated the
same for all employment-related purposes . . . ."  42 U.S.C. § 2000e(k).

     [2] New York Executive Law § 296 provides that

     It shall be an unlawful discriminatory practice for an employer or
     licensing agency, because of the age, race, creed, color, national
     origin, sexual orientation, military status, sex, disability . . . or
     marital status of any individual, to refuse to hire or employ or to bar

the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq.*[3] Plaintiff seeks declaratory relief; reinstatement; monetary damages in the form of back pay, front pay, and lost benefits; and punitive damages. Presently before the Court is defendant Natori's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, defendant's motion is granted and the complaint is dismissed in its entirety.

## Jurisdiction

This Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3)[4] and 28 U.S.C. § 1331. This Court has

---

or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

New York Exec. Law § 296(1)(a).

[3] The New York City Administrative Code provides that

It shall be an unlawful discriminatory practice for an employer or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, torefuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107(1).

[4] 42 U.S.C. § 2000e-5(f)(3) provides in relevant part that

Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in

jurisdiction over plaintiff's state and local law claims under 28 U.S.C. § 1367.

## Background

The following facts are drawn from the Complaint and the parties' submissions in connection with this motion, including Local Rule 56.1 statements. Disputes are noted.

Plaintiff Kronen is female and was at all relevant times a domiciliary in the State of New York, residing at 36 East 36th Street, New York, New York. Defendant Natori is a foreign business corporation authorized to do business in the State of New York, with offices located at all relevant times at 180 Madison Avenue, New York, New York. Natori is a women's lingerie company founded by its chief executive officer, Josie Natori ("Mrs. Natori").

Plaintiff Begins Work at Natori

On June 1, 1999, plaintiff began working for defendant as Director of Public Relations and Marketing Communications ("Marketing"). She reported to then-President, Kathy Nedorostek

which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).

("Nedorostek"), who reported to Mrs. Natori.  In plaintiff's
written performance evaluation for 2000, Nedorostek wrote that
"[plaintiff] needs to continue to work as a team and not just
part of her area.  Her biggest challenge is not to be so
defensive when someone is challenging her."  Def. Exh. 5,
Executive Evaluation Form 2000.  Nedorostek also noted that
plaintiff "has made very good productivity enhancements" and that
she "had significant accomplishments that positioned the brand to
a higher level of penetration."  *Id.*  Plaintiff received an
overall score of "3," which denotes "solid performer that
regularly meets all and occasionally exceeds performance
standards of the job."  *Id.* P000048.  In plaintiff's written
performance evaluation for 2001, Nedorostek wrote that plaintiff
had "met all 2001 objectives" and "had significant
accomplishments."  Def. Exh. 6.  Nedorostek also wrote that
plaintiff "is very comfortable with the people that she has
worked with or know [sic].  Her biggest challenge as stated in
her 2000 review is that she needs to work on not being so
defensive when one is giving constructed [sic] criticism or
challenging her.  She needs to work within a team structure."
*Id.* P000043.


Plaintiff's First Pregnancy

    In February or March 2002, plaintiff became pregnant and

gave birth to a son in November 2002.  She informed Natori about her pregnancy in mid-2002, about nine weeks into her pregnancy. Kronen Dep., pp. 23-25.  Plaintiff negotiated maternity leave benefits that exceeded the usual benefits under defendant's maternity leave policy.  Natori granted plaintiff's request for an extra week of vacation, allowed her to take unaccrued vacation, sick days, and personal days from the following year. *See* Montellese Declaration ¶ 12.  She was afforded more than twelve weeks of leave "because [she] had a C-section."  Kronen Dep., p. 26.  Kronen stated in her deposition that Natori did not discriminate against her with respect to her maternity leave benefits.  Kronen Dep., p. 68.

While on maternity leave, plaintiff requested a modified work schedule so that she could spend more time with her son. Mrs. Natori approved plaintiff's request to work from home on Thursdays.  Under their agreement, plaintiff would remain a full-time employee with full benefits, with a 20 percent reduction in pay.  Kronen Dep., p. 50; Mrs. Natori Dep., p. 36-38.  Plaintiff lived two blocks away from the office.  Plaintiff never requested to return to a schedule in which she worked at the office five days per week.  Kronen Dep., p. 57.  Under the modified schedule, plaintiff also worked on about one weekend per month.

"Baby Road Trip"

Toward the end of her maternity leave, during a road trip to Florida, plaintiff developed a concept for a children's video series called "Baby Road Trip."

On July 8, 2002, Kronen began reporting to Cindy Wigda ("Wigda"), who Mrs. Natori had hired as Mrs. Natori's executive assistant and a supervisor for the Marketing Department. In plaintiff's written performance evaluation for 2002, Wigda wrote that "[c]ommunication with [Mrs. Natori] has improved . . . and while Laura has worked hard to not unnecessarily push back when her opinion/views are challenged, there is still room for improvement. Laura is aware that this is an area where she could improve and has sought advice and has been open to suggestions." Def. Exh. 7, D001764.

On April 4, 2003, Kronen began reporting to Mrs. Natori.

In May 2003, plaintiff incorporated Baby Is A Star, an entity that would develop and produce the Baby Road Trip video series. During plaintiff's period of employment with Natori, plaintiff produced and marketed three such videos. Kronen Dep., p. 153-155. Plaintiff testified that the owner and photographer of Photopix, which was a vendor for Natori[5], allowed plaintiff to use the photographer's studio to shoot the Baby Road Trip videos. Kronen Dep., p. 157. Another vendor for Natori, a printing

---

[5] Kronen brought Photopix as a vendor for Natori around 2000. Kronen Dep., p. 156.

company called Triumph Graphics, made a banner for Baby Is A Star as a "favor" to plaintiff. Kronen Dep., p. 200. Plaintiff engaged in marketing and public relations work on behalf of Baby Road Trip. Kronen Dep., p. 210-11.

Defendant Natori did not maintain a written policy regarding employees maintaining or operating other businesses while employed at Natori. Mrs. Natori Dep., p. 17. Plaintiff states that at least one employee, Sally Romero ("Romero"), sold cosmetics for a company called Mary Kay during working hours at Natori. Plaintiff's Rule 56.1 Counterstatement ¶ 20. Because this work was done in the Philippines and Romero's clients were largely her own friends, Mrs. Natori did not consider this inappropriate. Mrs. Natori Dep., p. 75-76. In connection with plaintiff's work for Baby Road Trip, Mrs. Natori testified, however, that the modified work schedule was

> an accommodation. Then the fact that we are not really getting what we think we needed and then to see that was something that, to me, I said, we can't live with this. Then to find out – that, to me, that is to have have somebody work on a side business. That is just against total – my principles and our policies. . . . Being a full-time person should be a full-time person. . . . Exclusively being employed by Natori.

Mrs. Natori Dep., p. 16-17.

Mitchell Begins Restructuring Natori

On September 2, 2003, plaintiff began reporting to Jessica Mitchell ("Mitchell"), Senior Vice President of Sales,

Merchandising, and Marketing, and who had been hired by Natori

that same day. Mitchell's "highest priority was working with

senior management to reassess Natori's business strategy."

Mitchell Declaration ¶ 8. In late 2003, Mitchell took over the

Merchandising Department and recommended that "Natori refocus its

resources on its core lingerie brands business, discontinue the

private label business with Walmart, and discontinue the

accessories business." *Id.* ¶ 9.

In plaintiff's written performance evaluation for 2003,

Mitchell noted several professional accomplishments, and also

stated that

> however, Laura needs to examine her attitude and approach to
> each and every process she commands or executes. Laura, for
> whatever reason, approaches each opportunity with all the
> negative reasons why it won't succeed. . . . (The irony is
> that she does make them succeed in spite of her approach).
> There is an unnecessary negative impact on whoever is
> involved in the process. She has noted that she feels
> underappreciated and does not feel that she has been
> recognized for her contributions to the company which comes
> through in her approach. Also, while she is at work, Laura
> needs to focus on the issues at hand and less on family
> issues.

Def. Exh. 8, P000034.

By mid-2004, Natori was working to develop a new "Josie

Natori" brand, which was launched in January 2005. "After Natori

decided upon the new business strategy, Mrs. Natori and

[Mitchell] had discussions about how to restructure the operating

departments so that they would best service that strategy."

Mitchell Declaration ¶ 10. They discussed trying "a different approach to marketing," *id.*, and "discussed the possibility of eliminating the director-level position, retaining an outside marketing firm with senior-level contacts to provide Natori with greater exposure, and hiring a junior employee to handle the trafficking of samples to editors and coordinating tasks that Kronen was performing at the time." *Id.* Mrs. Natori testified that she recalled discussing the elimination of Kronen's position with Mitchell "[q]uite honestly from the time that we hired Jessica [Mitchell]. She had a different view of how [public relations] should be done." Mrs. Natori Dep., p. 49; *see also* Mrs. Natori Declaration ¶ 12. During those discussions, Mitchell "explained that I had too many other concerns on which I placed a much higher priority, and could not take on any additional responsibilities that restructuring the Marketing Department would likely entail – such as taking over Kronen's duties while we searched for and trained a junior employee, and finding and retaining an outside firm." Mitchell Declaration ¶ 11; Mitchell Dep., p. 66; Mrs. Natori Dep., p. 59.

Plaintiff's Email Exchange with Bauer

In early 2004, plaintiff sought the services of a third Natori vendor, a web development consultant named Boris Bauer ("Bauer"), but Bauer refused to provide services for the Baby

Road Trip videos.  In response, in an email dated February 19,

2004, plaintiff threatened to terminate Bauer's relationship with

Natori.[6]  An individual to whom the email exchange was also sent

apparently forwarded the exchange to Mrs. Natori on March 22,

2004.  On that same day, Mrs. Natori forwarded the email exchange

to Mitchell and Montellese, stating "fyi...we need to deal with

her sooner than later!!!!"  In connection with the email

exchange, Mrs. Natori testified that "I wanted [Mitchell and

Montellese] to be dealing with this.  As far as I'm concerned,

that was grounds for dismissal way back in February.  That's how

firm I was with that, but [Mitchell] is the supervisor and she

had to do it when she could do it."  Mrs. Natori Dep., p. 24.

Mrs. Natori further testified that she determined that plaintiff

---

[6] In an email dated February 19, 2004, plaintiff wrote to Bauer:

You were verbally abusive to me, refused to return any emails or phone calls to me and flat out said you never wanted to hear from me again, in writing.  Now, please tell me why you would expect that I would contact you for work on the Natori site?  You obviously did not want to work with me, and since I am the person who is in charge of the Natori website and its maintenance, you could not possibly expect that I would ever contact you again, especially when TOLD never to do so. . . . Therefore, the relationship with Natori is over and I do not wish to hear from you again.

Def. Exh. 15, Email Exchange between Kronen and Bauer dated February 19, 2004. Bauer responded in an email dated the same day, stating,

This was related to BabyRoadTrip.com your private project.[] I never said that in relation to Natori.com.  You are using your position at Natori to get your private project done.  Offering creative people Natori's account to leverage expenses on your private account.

*Id.*  Responding to plaintiff's statement that "the relationship with Natori is over," Bauer wrote, "This will be not that easy because we are talking about a large financial loss on my side resulting from the loss of Natori as a client." *Id.*

could not keep her employment "[b]ecause her performance in the work wasn't getting done in my mind of what we needed. That is one. And second, that whole principle of having a business on the side to me was not acceptable." Mrs. Natori Dep., p. 26. Mitchell states that "[w]hen Mrs. Natori raised the Bauer Email issue with me later, it was clear to me that she thought plaintiff's employment should be terminated. However, I was still too busy with higher priorities . . . ." Mitchell Declaration ¶ 21.

In spring 2004, the size of the Sales Department decreased substantially when the Vice President of Sales and two other salespeople resigned, reducing the department to two salespeople. Mitchell therefore made hiring and training in the Sales Department a top priority during the summer and fall of 2004. She also oversaw the hiring of employees for the Design Department. *See* Def. Rule 56.1 Statement ¶ 47.


<u>*Working Mother* Magazine Article</u>

In May 2004, Mitchell saw an article in *Working Mother* magazine that emphasized plaintiff's sense of style and fashion. The article identified plaintiff in bold font as the Founder and President of Baby Road Trip. Underneath the text in bold font, the article described plaintiff as an "entrepreneur who's kept her day job as PR director at Natori." Def. Exh. 17, *Working*

*Mother* magazine article. Mrs. Natori also saw the article shortly after it was published, and emphasized to Mitchell that plaintiff should be terminated.[7] Mitchell again explained that she could not take on the additional responsibilities that Kronen's termination would entail. "In May 2004, Mitchell met with plaintiff and reprimanded her for promoting plaintiff's own company, Baby Road Trip, over Natori in the magazine article, and for taking advantage of the Company's decision to grant her a four-day schedule by using her time away from the office to promote another company." Def. Rule 56.1 Statement ¶ 52 (citing *inter alia* Mitchell Dep., p. 56)[8]. Kronen explained that Baby Road Trip donated a portion of its profits to charity and assured Mitchell that she was committed to her job at Natori. Citing

---

[7] Mrs. Natori described her discussions with Mitchell regarding the magazine article in her deposition, stating

Well, I mean, this is like – this is it, you know. This is really – to me, in my mind, from February, this was not correct and it's not working. I wanted [Mitchell] to deal with [Kronen], so I think she just had taken her time and then when this article came, I said, this is enough.

Mrs. Natori Dep., p. 28.

[8] Mitchell stated in her deposition that

I told [Ms. Kronen] that I was shocked to see this article and this photograph and I wanted her to explain to me how . . . she could be employed as an employee of Natori and be promoting herself as an entrepreneur heading another company. I told her that I felt that it was very bad form to be the head of publicity of a company that's a major company like Natori and be promoting herself as an entrepreneur. And I told her that I thought that it was very unprofessional. And I wrote up . . . the contents of the meeting in an email and told her that I would do that and put it in her file, which I did.

Mitchell Dep., p. 56.

plaintiff's email exchange with Bauer and the *Working Mother* Magazine article, Mitchell warned plaintiff "that we had the perception that she was focused elsewhere and that she needed to correct this within three months." Def. Exh. 18, Email from Mitchell to Mrs. Natori and Montellese dated May 19, 2004.

Over the next few months, Mitchell devoted her time to hiring personnel for and developing the Merchandising and Sales Departments.

Natori's National Advertising Campaign

On November 11, 2004, plaintiff and Mitchell exchanged a series of emails concerning a photo shoot for a national advertising campaign that was taking place the following day on November 12, 2004. The photo shoot was Natori's only national advertising shoot for the year. Plaintiff wrote to Mitchell, stating

> So what is going on for tomorrow? Sarah mentioned you
> wanted the samples hand carried specifically by me for some
> reason. While I feel honored, I don't know if that's
> entirely possible given the call time tomorrow and the
> amount of fabric to be taken there.

Def. Exh. 19, Email Exchange between Mitchell and Kronen, dated November 11, 2004 ("Mitchell-Kronen Exchange"). Mitchell replied to Kronen, stating that Mrs. Natori and she had an important meeting on November 12 in the company showroom and instructing plaintiff to do two things for the photo shoot. First, plaintiff

was to arrive at the shoot at 7:00 a.m. to represent the company.

Second, plaintiff was to transport antique textiles from the

company archives to the shoot.  *See* Def. Exh. 19, Mitchell-Kronen

Exchange; Mitchell Declaration ¶ 29.  Plaintiff responded that

> my husband has graciously volunteered to pick up the samples
> and other items from Natori tonight.  He knows it is
> impossible and against doctors orders for me to be carrying
> them myself.  He will bring them to the house and I will
> take them to the shoot in the morning once my nanny arrives.
> They will not be anywhere near shooting by 8:30 so I am sure
> this is no problem.

Def. Exh. 19, Mitchell-Kronen Exchange.  Mitchell, "outraged that

Kronen would try to delegate her responsibilities to someone with

no professional relationship to Natori," Mitchell Declaration ¶

33, emailed plaintiff, "Please call me."  Def. Exh. 19, Mitchell-

Kronen Exchange.  Plaintiff replied again by email, stating

> As much as I would love to help out, I cannot be at the
> shoot at 7 am.  I have a child to take care of.  Absolutely
> nothing happens in the first hour or two except air kissing
> and breakfast . . . . I was never informed that the shoot
> wouldn't start at a normal hour or I would have attempted
> other plans.

Def. Exh. 19, Mitchell-Kronen Exchange.  Mitchell wrote back to

plaintiff,

> There is no need for you to come to the shoot tomorrow. . .
> . We have organized the sample situation so you do not need
> to be involved . . . . I am not sure what time I will be at
> the shoot, but Andrew [an independent contractor] will
> represent Natori at 7 a.m.  I am very disappointed in the
> way you have handled this situation.

*Id.*

Plaintiff's Position Is Eliminated

Between November 11 and 17, 2004, the week after the national advertising shoot, Mitchell decided to reorganize the Marketing Department by eliminating plaintiff's position, taking over some of plaintiff's duties herself, hiring an entry-level employee to coordinate transfers of samples to magazine editors, and retaining a well-connected outside marketing firm on an as-needed basis. Mitchell Dep., 64-69; Mitchell Declaration ¶ 36. Mitchell's plan was based on her determination that most of Kronen's time was spent coordinating tasks that did not require a director's skills, that Natori needed strong fashion media contacts that Kronen did not have in order to generate more media attention, and that hiring a junior level employee to coordinate tasks and a marketing firm from time to time would be more cost-effective than retaining a full-time director. Mitchell's decision to eliminate plaintiff's position was also based on what Mitchell describes as plaintiff's "longstanding attitude problem" and her "sarcastic and insubordinate behavior during the National Ad Shoot." Mitchell Declaration ¶ 35. Mrs. Natori and Montellese approved Mitchell's plan in mid-November.

On November 17, 2004, according to Montellese's instructions, Natori created a separation agreement for plaintiff, specifying a termination date of November 22, 2004. *See* Def. Exh. 20, Separation Agreement and General Release

between Kronen and Natori, Nov. 2004.  However, Mitchell and Montellese decided to postpone terminating plaintiff's employment until after January 2005, after the Thanksgiving and winter holidays and after the sales and marketing activity that increased towards the end of the year.

In January 2005, Mitchell and Montellese planned to terminate plaintiff's employment on February 7, 2005, during plaintiff's regular weekly meeting with Mitchell.  Michell Dep., pp. 74-75; Mitchell Declaration ¶ 43.  On the morning of February 7, 2005, plaintiff informed Mitchell that she would be out sick that day.  Mitchell and Montellese rescheduled their meeting with plaintiff for February 14, 2005, the next day that Mitchell, Montellese, and Kronen were scheduled to be in the office.

On February 8, 2005, plaintiff informed Pamela Gold ("Gold"), Mrs. Natori's executive assistant and the company's Administrative Director, that she might be pregnant and that she had a physician's appointment on February 14, 2005.  Kronen Dep., p. 77.  Plaintiff and Gold were friends, and "empathized with each other" because they had both had miscarriages in 2004. Kronen Dep., p. 70; Gold Dep., p. 33.

On February 11, 2005, another separation agreement was prepared for plaintiff specifying February 14, 2005 as the termination date.  Def. Exh. 22, Separation Agreement between Kronen and Natori, Feb. 2005.  On February 14, 2005, when

plaintiff returned to Natori's offices after her physician's appointment, plaintiff received an instant message on her work computer from Gold, inquiring about how the appointment went. Plaintiff replied that the appointment went well and that her pregnancy appeared viable.

About five hours later, Mitchell and Montellese met with plaintiff. Mitchell informed plaintiff that her position was being eliminated. Plaintiff stated in the meeting "that they knew that I was pregnant already." Kronen Dep., p. 83. Kronen testified that while she "[did not] know for sure" whether Gold told anyone at Natori about her pregnancy, she believes that Gold did so. Kronen Dep., p. 77. She stated that she believes that the decision to terminate her employment was made on February 14, 2005, "[b]ecause I told Pamela Gold, the administrative director of the company, that I was pregnant, and five hours later I was fired." Kronen Dep., p. 84-85. Plaintiff stated that she had no other reason to think Gold told others about her pregnancy. Kronen Dep., pp. 77, 111.

Later that day, after hearing that plaintiff had said at the meeting that Gold had informed senior management about her pregnancy, Gold sent plaintiff an email stating in "sum and subtance" that "I want you to know that I didn't betray your confidence. I wanted her to know that I didn't tell anybody that she was pregnant." Gold Dep., p. 68. When Gold was asked during

her deposition if she recalled discussing Kronen's pregnancy with other Natori employees, Gold responded, "Absolutely not." Gold Dep., p. 34. Mitchell testified that she was unaware of plaintiff's pregnancy before the February 14, 2005 meeting. Mitchell Dep., p. 123. Montellese states that at the meeting, "Kronen said that Natori could not terminate her employment because she was pregnant. That was the first I ever heard about that pregnancy, and I was surprised by the news." Montellese Declaration ¶ 40. When Mrs. Natori was asked during her deposition if she ever learned at any point that Kronen was pregnant on February 14, Mrs. Natori answered, "God, no . . . . Way after that I heard about it." Mrs. Natori Dep., p. 79.

## Discussion

### Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). In deciding such a motion the trial court must determine whether "after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

## Title VII, NYSHRL, and NYCHRL[9]

When analyzing Title VII discrimination claims, courts apply the three-step burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *cited in inter alia Stainkamp v. Changes International of Fort Walton Beach, Inc.*, 373 F.Supp.2d 163, 166 n. 2 (E.D.N.Y. 2005) *and Pace v. Fisher Price*, 2005 WL 3360452, at *3 (E.D.N.Y.

---

[9] "[T]he analysis of discrimination claims under the NYSHRL and the NYCHRL is parallel to that of Title VII claims." *Pace v. Fisher Price*, 2005 WL 3360452, at *3 n. 1 (E.D.N.Y. 2005) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000)); *see also Stainkamp v. Changes International of Fort Walton Beach, Inc.*, 373 F.Supp.2d 163, 166 n. 2 (E.D.N.Y. 2005). Accordingly, all of plaintiff's claims are analyzed together.

2005).  In order to establish a *prima facie* case of pregnancy

discrimination, plaintiff bears the initial burden of showing

that: "(1) she was a member of a protected class; (2) she was

qualified for the position from which she was terminated; (3) she

suffered adverse employment action; and (4) the position from

which she was terminated was filled by a comparably qualified,

non-pregnant employee."  *Pace*, 2005 WL 3360452, at *3; *see also*

*Stainkamp*, 373 F.Supp.2d at 166; *Quaratino v. Tiffany & Co.,* 71

F.3d 58, 64 (2d Cir. 1995).  The fourth element may also be

established by demonstrating that the "discharge occurred in

circumstances giving rise to an inference of unlawful

discrimination."  *Kerzer v. Kingly Manufacturing*, 156 F.3d 396,

400 (2d Cir. 1998) (applying *McDonnell Douglas* burden-shifting

analysis to pregnancy discrimination claim).

     In connection with the fourth element of establishing a

*prima facie* case, courts have required "a *prima facie* showing

that a defendant knew of a plaintiff's protected status in

connection with . . . discrimination claims."  *Woodman v. WWOR-

TV, Inc.*, 411 F.3d 69, 81 (2d Cir. 2005) (age discrimination case

in which the Court of Appeals cites pregnancy discrimination

cases in other circuits in support of proposition that a

defendant had to have knowledge of age discrepancy between

plaintiff and plaintiff's replacement).  While temporal proximity

of the adverse action is a relevant factor in inferring

discrimination, *see, e.g., Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991), "[i]n cases in which the employer claims that the decision to terminate was made prior to learning of plaintiff's protected status, the plaintiff must also 'adduce some evidence, whether direct or indirect, indicating a defendant's knowledge of the plaintiff's membership in the protected class.'" *Pace v. Fisher Price*, 2005 WL 3360452, at *4 (E.D.N.Y. 2005) (granting summary judgment in favor of defendant employer because plaintiff failed to show that defendant knew of her pregnancy before employer decided to terminate her employment) (internal citation omitted); *see also Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) (acknowledging that the "obviousness" of an employee's pregnancy necessarily "varies, both temporally and as between different affected individuals" and further stating that "[i]f the pregnancy is not apparent and the employee has not disclosed it to her employer," the employee must point to some "evidence from which a rational jury could infer that the employer knew that she was pregnant"), *cited in Woodman*, 411 F.3d at 82; *see also Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 443-44 (6th Cir. 2002) (holding that employer must have actual knowledge of employee's pregnancy in order to infer that employer discriminated against her); *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1007 and n. 7 (7th Cir. 2001). Therefore, "'a defendant's discriminatory intent cannot be

inferred, even at the *prima facie* stage, from circumstances unknown to the defendant.'" *Steinkamp*, 373 F.Supp.2d at 166 (quoting *Woodman*, 411 F.3d at 82).

"A plaintiff's burden to establish a *prima facie* case of discrimination is *de minimis.*" *Id* (citations omitted).

Establishing a *prima facie* case raises a presumption of unlawful discrimination against plaintiff. "[T]he burden then shifts to the employer to show a legitimate, nondiscriminatory reason for the employee's termination." *Pace*, 2005 WL 3360452, at 3 (citing *McDonnell Douglas*, 411 U.S. at 802). If the employer rebuts the presumption of discrimination, then the plaintiff must show by a preponderance of the evidence that the employer's stated reason was pretextual. *Id* (citations omitted). "An employer's reason for termination cannot be proved to be a pretext . . . 'unless it is shown that the reason was false, and that discrimination was the real reason.'" *Kerzer*, 156 F.3d at 401 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993)).

Application

There is no dispute that plaintiff was pregnant when her employment at Natori was terminated. As a member of a protected class under Title VII, plaintiff therefore meets the first requirement of establishing a *prima facie* case. Whether

plaintiff meets the second requirement, that she was qualified for the position she lost, is, at the least, a jury question. Although plaintiff's performance evaluations consistently classified plaintiff as "a solid performer," senior management was dissatisfied with what it characterized as plaintiff's "attitude" and insubordinate behavior, such as plaintiff's use of Natori vendors to promote her own company and her unwillingness to follow Mitchell's instructions in connection with Natori's national advertising campaign in November 2004. Plaintiff meets the third requirement because she suffered an adverse employment action when her employment was terminated. *See Boyce v. Bank of New York*, 2006 WL 3147452, at *1 (2d Cir. 2006) (identifying termination of employment as adverse employment action); *Galabya v. New York City Board of Education*, 202 F.3d 636, 640 (2d Cir. 2000) (stating that "a materially adverse change might be indicated by a termination of employment") (citation and internal quotation omitted).

Defendant argues that plaintiff does not meet the fourth requirement of a *prima facie* case, which requires that her discharge must have occurred under circumstances raising an inference of discrimination based on her pregnancy,[10] because plaintiff has not adduced evidence demonstrating that defendant

---

[10] I do not analyze plaintiff's claims under the alternative fourth requirement of establishing a *prima facie* case, whether the position from which she was terminated was filled by a comparably qualified employee, because plaintiff's position was eliminated altogether.

knew of her pregnancy before defendant decided to terminate her
employment. *See* Def. Memorandum in Support of Motion for Summary
Judgment, pp. 19-25. Plaintiff stated in her deposition that she
believed that Gold informed senior management about plaintiff's
pregnancy on February 14, 2005, the day plaintiff's employment
was terminated. Kronen Dep., p. 84-85; *see also* Plaintiff's
Opposition Memorandum, p. 2 ("Plaintiff was terminated
approximately five (5) hours after she disclosed her pregnancy to
defendant."). The record establishes that at the latest[11],
defendant had decided to terminate plaintiff's employment on
February 11, 2005, when the termination agreement was altered to
reflect February 14, 2005 as plaintiff's termination date. Even
assuming Gold had informed Mitchell and Montellese about
plaintiff's pregnancy on February 14, 2005[12], the decision to

---

[11] Defendant previously recorded its intention to terminate plaintiff's
employment by drafting a separation agreement in November 2004. However,
Mitchell decided to retain plaintiff until after the Thanksgiving and winter
holidays. Mitchell testified that in January 2005, Mitchell and Montellese
planned to terminate plaintiff's employment on February 7, 2005, during
plaintiff's regular weekly meeting with Mitchell. Michell Dep., pp. 74-75;
Mitchell Declaration ¶ 43. On the morning of February 7, 2005, plaintiff
informed Mitchell that she would be out sick that day, and the meeting was
postponed until February 14, 2005.
     I also note that on a page listing the properties of the separation
agreement's computer file, the "Filename" is "GEN RELEASE New York" and the
"title" reads "Seabrook Release." The text of the agreement specifically
identifies "Laura Kronen" and Natori as the parties to the separation
agreement. Def. Exh. 20, November 2004 Separation Agreement.

[12] I note that Gold, the only individual who could have informed senior
management of plaintiff's pregnancy, testified that she did not tell anyone
about plaintiff's pregnancy. Gold Dep., p. 34. At the time of plaintiff's
employment termination, Gold wrote to plaintiff stating that she had not
"betrayed [plaintiff's] confidence." Gold Dep., p. 68. All members of senior
management, Mitchell, Montellese, and Mrs. Natori, testified that they were
not aware of plaintiff's pregnancy until after plaintiff's termination.

terminate plaintiff's pregnancy had already been taken.
Accordingly, plaintiff has not established a *prima facie* case of
employment discrimination. *See Geraci v. Moody-Tottrup,
International, Inc.*, 82 F.3d 578, 582 (3d Cir. 1996) (dismissing
pregnancy discrimination claim for failure to make *prima facie*
case where plaintiff had informed six of twenty co-workers about
her pregnancy approximately one month before plaintiff was laid
off and where "managers . . . filed declarations disclaiming
knowledge, and [plaintiff] presented no evidence to the contrary"
and one of co-workers testified that he did not inform
management); *see also Stainkamp v. Changes Int'l of Fort Walton
Beach, Inc.*, 373 F.Supp.2d 163, 167-68 (E.D.N.Y. 2005) (granting
summary judgment to employer where employer terminated plaintiff
two days after learning of plaintiff's pregnancy because
plaintiff did not bring evidence that employer was aware of
pregnancy at the time he decided to terminate her employment);
*see also Pace v. Fisher Price*, 2005 WL 3360452, at *5 (same).

Even assuming plaintiff has established a *prima facie* case
of discrimination, she cannot demonstrate by a preponderance of
the evidence that defendant's stated reasons for terminating
plaintiff's employment – that defendant sought to improve its
marketing strategy by eliminating plaintiff's position and that
the decision was partly based on plaintiff's "longstanding
attitude problem" and "insubordinate behavior" – were pretextual

or false.  Defendant has presented ample evidence, which
plaintiff does not rebut, of its intention to develop a new
marketing strategy and of instances of what it characterized as
"insubordinate" behavior such as plaintiff's use of Natori
vendors for her own business and her conduct in connection with
defendant's November 2004 advertising campaign.  Therefore, no
reasonable juror could infer discrimination from the
circumstances surrounding plaintiff's employment termination.
Accordingly, summary judgment is granted in favor of defendant
Natori and plaintiff's claims are dismissed.


### Conclusion

For the reasons set forth above, summary judgment is granted
in favor of defendant and plaintiff's complaint is dismissed in
its entirety.

The clerk is directed to transmit a copy of the within to
all parties and to the magistrate judge.



SO ORDERED.

        Dated :   Brooklyn, New York
                  July 24, 2007


                  By: /s/ Charles P. Sifton (electronically signed)
                      United States District Judge